Acklen *et al. v.* State.

(*Nashville,* December Term, 1953.)

Opinion filed March 3, 1954.

D. L. Johnson, H. B. Weimar and Thomas L. Cummings, all of Nashville, for plaintiffs in error.

Knox Bigham, Assistant Attorney General, for the State.

MR. JUSTICE BURNETT delivered the opinion of the Court.

The plaintiffs in error were convicted of a conspiracy to violate various gaming statutes. Acklen's punishment was fixed at a fine of $750 and a six months workhouse sentence. The others received a fine of $100 and a three months workhouse sentence. The variation in fine is probably due to the fact that Acklen was the principal and the others were his subordinates.

The District Attorney General of Davidson County assigned one John Cole to investigate an alleged numbers racket in this County. After some investigation Cole learned that one of the defendants, League, was in possession of a Federal Wagering Stamp. He also received information concerning a certain automobile and a place where pickups were made each day. In March, 1952, he, Cole, parked his automibile at Union Street and Capitol Boulevard and from there he saw the plaintiff in error Cartmell come to the back of the Hermitage Hotel and look up and down the street several times. After this had occurred several times League drove up and double parked his car back of the Hermitage when Cartmell then came and got in the car with him for a few minutes. The officer saw papers pass between these two men. After these papers had been passed League drove off at a rapid rate of speed and did not slow down as he crossed Union Street. The officer then started after him and turned on his siren and as a result of this League stopped. The officer asked League for his license and as a result of this

request League reached in his shirt pocket and pulled out his Federal Wagering Stamp and some numbers tickets, which he handed to the officer. The officer says that he was asking for the driver's license. After these things were handed to the officer by League, League was arrested. Later, very shortly after the arrest of League, Cartmell was arrested and the two men were taken to the District Attorney General's office and after being talked to there for some time gave confessions which are to the effect that they dealt in numbers tickets. League stated that he worked for Acklen and that he picked up for a number of writers. Cartmell stated that he was a writer and that he had been turning in his tickets and money to League for about a year.

In addition to this testimony of Cole and the confessions referred to by these two parties, the State introduced certified photostatic copies of applications for Federal Wagering Stamps executed in the names of all the plaintiffs in error except Cartmell. On Acklen's application Turner, Kennedy, Richmond and League were listed as employees. On each of the other applications Acklen was listed as the principal in the wagering business. In addition to the wagering stamps there were also exhibited wagering tax returns filed in the name of Acklen for the months of November and December, 1951, and January, 1952. In each of these returns it was shown that he had collected quite a considerable amount of money for those three months from the wagering business. The returns are based on and he paid into the Federal Government 10% of the amount of money he received. The first month he paid the Government $275.91, the second month, $273.73, and the third month, $348.69.

The plaintiffs in error offered no proof on their behalf but rested at the conclusion of the above evidence offered on behalf of the State.

 We will first consider the third assignment of error wherein it is contended that the names appearing on the Federal Wagering Stamp application constitute insufficient identity of the plaintiffs in error as being the parties guilty of the crime charged. The imposition of the 10% Excise Tax is imposed by U. S. C. A., Title 26, Sec. 3285 et seq., and the Occupational Tax of $50 a year for each person engaged in the wagering business is imposed by Section 3290. This Court considered these sections in passing on a City ordinance of the City of Chattanooga which imposed a fine on one possessing these Federal Wagering Stamps in the case of *Deitch* v. *City of Chattanooga,* 195 Tenn. 245, 258 S. W. (2d) 776. In the very excellent brief filed on behalf of the plaintiffs in error it is forcibly and ably contended that the names appearing on these stamps are not sufficient identity to support a conviction of the parties without other proof. A number of authorities are cited in behalf of this position which are indeed persuasive. The State in answer to this contention has likewise filed an able brief on the question wherein it is conceded that the authorities on the question are about equally divided. These authorities offered on behalf of both the plaintiffs in error and the State are annotated in 11 A. L. R. (2d) 884, and are in cases in subsequent offender prosecutions but as a matter of fact the reasoning there should be the same as is to be applied herein. Obviously the State relies upon those authorities which say that the identity of the name of the defendant and the person previously convicted is prima facie evidence of the identity of the person, and in the

absence of rebutting testimony, supports a finding of such identity. To the contrary the plaintiffs in error cite those authorities which say that mere proof of identity of names is not sufficient proof in itself to justify the finding of identity of person and the imposition of an enhanced penalty. In the first place the burden is on the prosecution in the case before us to establish the identity of accused as the one that is listed in these gambling stamps. This obviously is a question of fact for the jury. The circumstances in the instant case, it seems to us, justify a presumption of identity of person from the identity of name. In this case the signature of the plaintiffs in error is purportedly affixed and was signed by these persons when they applied for the stamp. On each application a Nashville address is given. It seems too, to us that these questions of whether or not these were the parties listed in these applications for the stamps were the parties who were there in court and charged with this offense was a question which was peculiarly within the knowledge of each of the plaintiffs in error. Whether or not he was the one who made the application for the stamp, whether or not he lived at that address, whether or not that was his signature. All of these questions could have been very easily answered by the plaintiffs in error or the implication thereof denied by the plaintiffs in error without the plaintiffs in error themselves taking the witness stand—these things if not true could have very easily been shown by others. Therefore it seems to us that the offering of these applications with the names affixed, etc., as above indicated raised a prima facie presumption that the parties then before the court are the same as those mentioned in these stamps. We think therefore that the court and jury were justified in con-

320

sidering against each of these parties the fact that they did not offer countervailing testimony. These things certainly offered some substantial credible testimony, under the circumstances, that the parties named in these stamps, addresses given, etc., were those charged in the indictment. Thus without anything being offered to the contrary this question must be resolved against the plaintiffs in error.

█ Thus it must appear that a conspiracy is abundantly proven. This Court said in *Brinkley* v. *State,* 125 Tenn. 371, 386, 143 S. W. 1120, 1123:

"There is a direct and open connection between the possession of a federal license authorizing the retail sale of intoxicating liquors and the ultimate fact of such sale. The interests of men are such, and experience teaches, that they do not ordinarily incur the expense and trouble of procuring license to engage in the sale of intoxicants, unless they intend to do so. Apart from the statute making the possession of such license prima facie evidence of the fact of a sale, the inference might well be drawn, in the absence of all rebutting proof, that one who pays the fees and possesses himself of such license is engaged in the sale of intoxicants."

█ We in *Deitch* v. *City of Chattanooga,* supra, used this identical quotation as applicable to the situation there of those possessing stamps as herein possessed. What this Court long ago said above in reference to a Federal Liquor License obviously and of course is equally applicable to the possession of Federal Wagering Stamps. It will not be gainsaid that common sense dictates the conclusion that these parties would not have gone to the trouble and expense complying with this Fed-

eral law unless they fully intended to engage in the activity of which the tax was levied and paid. It thus appears that the agreement between the parties is evidenced by these records, which show that Acklen listed four of his co-defendants as employees in the business and that the other applicants without exception tied themselves to Acklen by listing him as the principal. Acklen's tax returns show a substantial income from these wagering activities for a period of three months immediately prior to the arrest of the parties herein and that his business was actually conducted.

█ It is very ably and forcefully argued on behalf of the plaintiffs in error that the prosecution herein is limited to a conspiracy to engage in the numbers racket but that the proof could indicate any number of wagering activities other than this. These parties were indicted for a conspiracy to violate a number of gaming statutes. Code, Sec. 11064. The fact is as so commonly said, the book on gaming was thrown at them. The first count charges a conspiracy to violate the lottery act, Sec. 11302 et seq.; the second a conspiracy to vend lottery tickets, Sec. 11303; and the third a conspiracy to violate the general statute against gaming, Sec. 11275 et seq.; and the fourth a conspiracy to violate the statute making it an offense to promote gaming, Sec. 11276. Aside from this the evidence would establish a conspiracy to engage in the numbers game. We have not yet, in this opinion, considered the admissibility of this evidence but we will do so and of course our research and conclusions have been reached prior to the writing of this opinion. A, Conspiracy, to our minds, having been shown, the acts of League and Cartmell can be considered against their co-defendants. *Solomon* v. *State*, 168 Tenn. 180, 76 S. W. (2d) 331.

■ By the first assignment of error it is insisted that the evidence received from League and Cartmell was obtained by an unlawful search and therefore inadmissible. It seems to us that even though the arrest of League might have been considered unlawful, we do not so hold or think, it does not follow that the evidence obtained was inadmissible and incompetent. The articles which Cole secured were secured by him without making any search at all because when he blew his siren and drove up by League, League voluntarily handed these things to Cole when he requested his license. It seems to us therefore that this evidence came into the hands of the State by the act of League rather than that of Cole. Many years ago this Court had before it a related question in *Billingsley* v. *State,* 156 Tenn. 116, 299 S. W. 797, wherein the opinion was rendered for this Court by Mr. Justice McKinney. Briefly the facts in that case were that certain officers illegally trespassed upon property of another without a search warrant and when they did so Billingsley ran, even though he was on his own property, and as he went over a fence he pulled a pistol and shot at the officers, Billingsley was convicted of carrying a pistol. The evidence that he was carrying a pistol was objected to on the identical ground here raised; this Court said:

"The evidence as to the pistol was not obtained as a result of an unlawful search or an illegal arrest. If the defendant had not drawn his pistol and exhibited it, the officers would not have seen it."

The same could be said in reference to the evidence here that League produced and under like circumstances. The question is very closely related to one that this Court rendered an opinion on December 12, 1953, of

*Harry Wilson* v. *State,* unreported, wherein certain officers armed with a search warrant to search the home of Wilson, found nothing illegal. They had started to leave the home when Wilson drove up in front of the house and seeing the officers he sped down the road and his car turned over and the officers followed him and as they approached they saw him throwing liquor out of the car. This Court held that where the same question is here raised on objection to the evidence because of his arrest etc., that the evidence was admissible because what they found was not a result of an illegal arrest.

It is next contended that the convictions herein should be reversed because the confessions of League and Cartmell were inadmissible as having been obtained as the result of the illegal search and seizure. We do not think that there was a search. It seems to us too that the plaintiffs in error are in no position to rely upon such an objection now because it was not specified on the trial of the case. See *Troxell* v. *State,* 179 Tenn. 384, 166 S. W. (2d) 777, and authorities collected and digested therein.

The defense in its brief and in argument before this Court has very ably cited, digested and relied upon a number of opinions of this Court such as *Cox* v. *State,* 181 Tenn. 344, 181 S. W. (2d) 338, 154 A. L. R. 809; *Smith* v. *State,* 182 Tenn. 158, 184 S. W. (2d) 390; *Robertson* v. *State,* 184 Tenn. 277, 198 S. W. (2d) 633, and others. That line of cases of course all based upon the proposition the highway patrol in stopping the cars in those different cases (different facts of course appearing in each case) that the highway patrol was merely using its right to inspect the driver's license as a subterfuge for stopping the car to try to see if the party therein had

324

liquor. We have had many such cases and when this Court feels that the act of arrest or stopping the car is purely a subterfuge we have sustained the position of the plaintiff in error and held the evidence secured thereby inadmissible. In the Cox case above, supra, as an illustration, the officers there followed Cox from a wet county into a dry county before stopping him. In the Smith case, supra, the Court held that the mere stopping was merely subterfuge and in the Robertson case, supra, also held that it was just a fishing expedition, the officers using as their only excuse for stopping the man was the fact that they saw one of the occupants of the car looking back. We do not think these and other similar cases authority for the position of the plaintiffs in error.

In *Hughes* v. *State,* 145 Tenn. 544, 238 S. W. 588, 596, 20 A. L. R. 639, among other things this Court said:

"But an officer may lawfully arrest a person if a breach of the peace is threatened in his presence. In such a case it is not necessary for the officer to see and know that the law is being violated. Indeed, he may arrest a person in order to prevent a violation of the law. In such a case he may lawfully arrest the person, if the circumstances are sufficient to justify the belief in the mind of a prudent officer, acting in good faith, that a breach of the peace is about to occur. Of course, an arrest for a breach of the peace cannot be justified merely upon belief or suspicion existing in the mind of the officer; but, where the actions of the person and the surrounding circumstances are such as to indicate a threatened breach of the peace, the arrest may be lawfully made."

The facts of the instant case, it seems to us, just about bring it within the proposition last above laid down.

Here the officer after investigation knew or had cause to believe that these gambling laws were being violated and then as a result of what he saw there he stopped this car. It seems to us that he had a right to do so. There was no search of the car but the evidence was then given to him voluntarily. We are convinced therefore that this evidence and the resulting confessions of League and Cartmell were admissible.

These confessions were not obtained at the time of securing this evidence from League. The confessions were given at a later time and at a different place than from where League was stopped. It has been held under similar circumstances that such confessions are admissible. In *Milbourn* v. *State,* 212 Ind. 161, 8 N. E. (2d) 985, an admission of guilt obtained through voluntary answers to questions were admissible and did not result through an invalid search. Of course insofar as we know, the admissibility of confessions has been determined on the proposition of voluntariness. Always in propositions of the kind it is said that these confessions were pulled out by duress, fear, hunger and thirst and many, many other things that are claimed to various circumstances that the confession was not voluntary. In the instant case there is no suggestion in this record that either of these confessions was involuntary.

This case has been ably briefed and argued on both sides. It has given us a considerable amount of interest and we have read all the authorities cited by counsel on both sides in addition to others and as a result thereof we have reached the conclusions above expressed. The judgments below must be affirmed.