CORNELIUS C. McCLARY

*v.*

STATE OF TENNESSEE.

362 S.W.2d 450.

(*Knoxville,* September Term, 1962.)

Opinion filed November 9, 1962.

48

Jess Parks, W. Corry Smith, Charles W. Lusk, Jr., Chattanooga, for plaintiff in error.

GEORGE F. MCCANLESS, Attorney General, WALKER T. TIPTON, Assistant Attorney General, Nashville, for the State.

MR. JUSTICE BURNETT, delivered the opinion of the Court.

McClary was convicted of professional gambling and sentenced to serve three (3) years in the penitentiary and was fined $1,000.00, from which judgment he has appealed.

Growing out of this prosecution a Thunderbird Ford automobile, which was used by McClary, was forfeited and sold. In that case which was based upon the facts shown in this criminal record, the Court of Appeals, speaking through Judge Hale, has rendered an opinion therein, wherein he concisely, thoroughly and fully sets forth the factual situation as shown by the record in this criminal case. The facts, as found by him, are abundantly supported by the record and clearly set forth

what the jury could have found under an overwhelming preponderance of the proof. The case of the State is based primarily upon the evidence of two witnesses. McClary offered no proof. The factual situation as found by the Court of Appeals is, as follows:

"The numbers racket is somewhat involved. First, there must be the salesman, or 'writer'. He takes bets from the bettors, using triplicate slips, one of which is given the bettor, and the writer gives one to the collector or 'bag man', or 'mainest bag man' who gives it to the banker. One is retained by the salesman. Such tickets contain a symbol for the salesman, show the amount bet on each number. If number 'hits' the return is about 500% to 600% of the amount bet. The odds against hitting seem to be greater than 1000 to 1. The winning number is determined by certain figures derived from the total sales of cases of eggs and total sales of pounds of butter on any certain market. It is evident that an automobile is of prime necessity for the salesman or writer to make his rounds, to the bag man in collecting from the salesman, and then getting the aggregate to the banker.

"The sales of these commodities are released about 10 A.M. each day; hence it is important that the bets be laid before that time and received by the banker before the cut off date; otherwise the banker could be victimized by numbers bet on after the aforesaid total sales had been announced.

"McClary, a resident of Cleveland, Tenn., had since 1954 been filing with the Federal Government tax returns and applications for registry to engage in wagering. The Internal Revenue Code defined

wagering as (a) any wager with respect to sports events; (b) wagering pools on sports events; and (c) lotteries. He was assigned the number 62-170P.

"Copies of his monthly returns from August 30th, 1960, to March 31st, 1961, showed he was accepting wagers averaging a little less than $4,000.00 per month, upon which he paid promptly 10% to the U. S. Treasury Department. The record does not show receipts prior to August, 1960. These returns were prepared for him by an attorney in Chattanooga.

"Of course, this demonstrates that he was engaged in gambling, authorizing among other things the conduct of a lottery.

"Now as to his activities in Hamilton County: He had been under 'surveillance' by Frank Mallicoat, a deputy sheriff, attached to the office of the District Attorney as a criminal investigator, who began his investigation some days prior to January 13th, 1961. On that date he began this surveillance of McClary and observed him in this Thunderbird coming out of Noah Reid Road into Bonny Oaks Drive. He saw Fred Ables (not identified in this record) in this same vicinity. This was about 10 A.M., which will be remembered as the target date in the butter and eggs racket. The next time he saw McClary was January 18th, about 10:05 A.M., when he observed McClary turn-in off of the Lee Highway into the Bonny Oaks Drive. He also again saw Fred Ables that same day. This was at the rock quarry, time not given. On Jan. 19th, he observed Ables traveling on Noah Reid. About 10:20 A.M. McClary came out of Bonny Oaks Drive and went North on No. 11.

"On Jan. 20th, 1961, Mallicoat had a warrant for the arrest of McClary and undertook to arrest him thereon at an underpass on Bonny Oaks drive. Mallicoat was in plain clothes and so far as the record shows was not known to McClary. However, his car was equipped with the usual two way radio equipment and antenna used by police officers, although not otherwise marked. When he was undertaking this arrest his car was blocking this underpass. McClary approached about 10:15 or 10:20. Mallicoat got out of his car to serve the warrant and when he did so McClary threw his Thunderbird in reverse, and after turning, left at a high speed. Mallicoat then quickly turned his car and followed at the highest speed he could make which was somewhat less than the Thunderbird. He (Mallicoat) was making about 100 miles per hour, but the Thunderbird was 'moving out. It was leaving the car that I was driving because that was as fast as I could travel.' But he did get close enough to see butter and eggs tickets floating in the air, some eight or ten feet in the air in the center of the road then being traversed by the Thunderbird, which dodged off into a side road. Mallicoat couldn't make this turn, ran past and after getting some gas went back to where he had seen these tickets floating in the air and found a number of them on the road. This was about 2/10ths of a mile from where McClary turned off of this road. He then followed this turnoff road and found the Thunderbird had slid off of the road but McClary had left, no doubt having business elsewhere.

"Some of these tickets were for butter and eggs (B.E.) some were for 'stock' i.e., covering a lottery on

stock sales, and some were a combination of both butter and egg and stock. Some bore date of Jan. 20th, 1961, the day of the arrest.''

Clearly, under this evidence, it was amply sufficient to establish that McClary was conducting a lottery in Hamilton County. The record shows that he was a professional gambler. So far as this record shows he had no other occupation and there was no reason for his presence in Hamilton County on these dates so near this crucial cut-off time of 10:00 A.M. When he saw the car of this officer, Mallicoat, blocking this underpass he immediately backed up and fled, and while doing so he began to get rid of the evidence of his crime by throwing these slips of the bettors out of the car window.

This case has been unusually well tried. The writer of this opinion for the Court is completely indoctrinated with the defense. Every step throughout this trial was argued and none conceded. We have the advantage of reading this record and of reading the argument on each step by one of three or all three of the distinguished counsel representing the plaintiff in error. We likewise have heard oral argument in Court by able counsel and have read with interest the very fine briefs and all the authorities cited therein.

 This case obviously from the statement above is based upon circumstantial evidence, but this in itself does not negative the guilt or the finding of the lower court and jury if this evidence when pieced together is sufficient to show the *corpus delicti* venue and guilt of the accused. Plaintiff in error comes to this Court presumed to be guilty and the burden is upon him to show that the evidence preponderates against such guilt. From

the review of the evidence above it immediately becomes clear to the reader of the record that the evidence does not preponderate against such guilt. The numbers game has many facets which are set forth by the evidence above summarized. This evidence shows without contradiction that the plaintiff in error came within the factual situation, under the explanation of the numbers racket above set forth, of one engaged in such a racket. When he fled on an attempt to arrest him, this was a circumstance against him. All of these things, fleeing, seeing the tickets flying in the air, and these different steps taken in the numbers racket, made purely a fact question for the jury to determine, under proper instructions of the court, as to whether or not there had been a violation of the gambling statute. It is shown by the record that all of these things, that is going to these different parties and doing these things was done in Hamilton County. The jury could find that these tickets, and the evidence certainly does not preponderate against such finding, were completely, or some of them were, filled out on the day of the charged crime, and that they were "live" or current lottery tickets. *Storey v. State,* 207 Tenn. 326, 339 S.W.2d 485.

■ It is shown that the plaintiff in error was the possessor of a Federal Wagering Tax Stamp and had filed tax returns and reported considerable amounts of income derived from gambling. This was shown by a clerk of the Internal Revenue Department who is in charge of these records, and that this stamp was taken out in 1954 in the name of Cornelius Carmack McClary, North Henderson Street, Cleveland, Tennessee. It was shown that at the time of the act here charged against the plaintiff in error that he had paid this tax and has been

issued a renewal Federal Wagering Tax Stamp in the name of C. C. McClary, North Henderson Street, Cleveland, Tennessee. It is likewise shown in the record that even though the clerk did not know the plaintiff in error that this renewal stamp bore an identification number the same as that issued to Cornelius Carmack McClary at the same address. (Tr. 119). Clearly, under such a showing it is a question for the jury and there being no evidence to the contrary they could hardly reach a different determination than the fact that C. C. McClary and Cornelius Carmack McClary, both living at the same address and having this same identification number, are one and the same person. This proof of the issuance of the original stamp in 1954 was not offered as proof of activities in 1954 but to connect the renewal of the stamp in the current year and to show that these were one and the same parties. It was purely for identification and is clearly admissible. *Mays v. State,* 145 Tenn. 118, 238 S.W. 1096.

Under such a situation as is shown herein we, or anyone else as far as that is concerned, would be blind if we did not conclude that the payment of this Federal Wagering Tax Stamp and the possessing of it and tax returns made upon it, did not raise a presumption of gambling during the period covered by such a stamp and/or the returns. Our case of *Acklen v. State,* 196 Tenn. 314, 267 S.W.2d 101, is clearly applicable to the factual situation here as it was in the Acklen case, supra. In *Tipton v. State,* 160 Tenn. 664, 28 S.W.2d 635, this Court implied in that holding that controverting evidence was needed or necessary to raise an issue of identity. In other words, where there is no controverting evidence

under such a factual situation the presumption is that they are one and the same person.

 It is very ably argued and was throughout this hearing that the *corpus delicti* has not been shown, or that it was necessary to show the *corpus delicti* before other proof was offered as to other elements of the offense charged. Of course, to all lawyers it isn't necessary that we give an explicit definition of *corpus delicti* (an excellent definition is given in *Kyle v. State,* 208 Tenn. 170, 344 S.W.2d 537). Suffice it to say that the term obviously means the body or substance of the crime charged. In establishing this it is necessary that the State establish in a case of this kind a violation of the statute and a criminal agency in someone producing such a violation. The proof of plaintiff in error's connection with this crime as the operating agent, although essential for his conviction, is not a part of the *corpus delicti.* In establishing this feature, that is the *corpus delicti,* the burden, of course, is upon the State, but the question of whether or not such has been established is primarily a function of the jury. Wharton's Criminal Evidence, Vol. 3, p. 445, sec. 970. Logically the *corpus delicti* is first established before proof is offered to show the guilt of any particular person in the commission of the offense, but as a practical matter evidence of the *corpus delicti* and the person charged with participation are often so intertwined that evidence of both issues is admitted at the same time, and the admission of this is clearly a discretionary matter for the court. Thus in this case to show the *corpus delicti* all that was necessary was to show that professional gambling was being conducted by someone. This was clearly shown by a review of the evidence above. Sec. 39-2032, T.C.A., makes it a felony to engage in

professional gambling and by the following section, paragraph (3), professional gambling is defined as "accepting or offering to accept for profit, money," et cetera, "risked in gambling, or any claim thereon or interest therein." This section continues by stating that the definition includes lotteries, policy or numbers games. Therefore, it seems to us that under this definition of professional gambling and the proof of the numbers game, this is proof of the offense. When we take this proof, excluding any inferences of presumption of plaintiff in error's guilt, there is still left in the record twenty-one policy slips, which were found in Hamilton County, and the acts which were shown, the filling out of these tickets, etc., on the date this arrest was made, and this clearly to our mind and under previous decisions of having such paraphernalia of this numbers game, showed the *corpus delicti*. *Storey v. State,* supra.

■ By these tickets, or paraphernalia, used in this game, and, since they are filled out in the normal procedure used in such game, it is only logical to infer that these tickets were being used in the operation of a numbers game. Thus by this proof it is shown that someone was engaged in professional gambling. As said by this Court:

"The test is furnished not by law but by logic and common experience; and it is satisfied when the basic facts proved warrant the conclusion that the ultimate fact or proposition in issue asserted by the proponent is the more probable hypothesis." *Farmer v. State,* 208 Tenn. 75, 343 S.W.2d 895.

■ Objection is made throughout this record, and assignments in support of these objections have been

58

duly made here, that the introduction of these tickets was erroneous because Mallicoat testified that he was familiar with the operation of such a game three years ago. He testifies likewise that the operation at the time this investigation was made and this offense committed was the same now as it was then. Even though he had not testified that it was the same now as it was then, which he did at transcript page 64, this would not affect the admissibility of the evidence but would only go to its weight and its credibility, which is purely a question for the jury.

It is likewise argued throughout this record and in the briefs that the trial judge erred in admitting lottery tickets which were not butter and egg tickets. The record does show that these tickets were separated by the witness and the butter and egg tickets were particularly sorted out from the other stock tickets. This fact would not be error because all these things were found there together and the tickets which were exhibited were all marked B & E, which is the notation that said tickets are butter and egg lottery tickets.

It is referred to in the finding of fact herein that the witness testified once or twice in regard to one, Fred Ables, who is allegedly a notorious gambler in Hamilton County. There is no evidence in the record as to who this Fred Ables was or that it was common knowledge that he was a gambler. Clearly this objection is not well made.

Of course, this Court for good reasons has never recognized the failure of a trial judge to direct a verdict in a criminal case as reversible error. *Sherrill v. State,* 204 Tenn. 427, 321 S.W.2d 811. The reasons for this rule are more evident than ever when there is ample evidence

to support the position of the State, and contrary to such a motion which was argued, setting forth the theories of the plaintiff in error at the conclusion of the State's proof.

It is assigned as error that on the voir dire the State asked the jury if they knew certain persons, and according to the argument, it is said this was an attempt to associate the plaintiff in error with known criminals. We find nothing in the record as to who these persons were, or their background, and it seems to us even though such might have been known to the counsel for the plaintiff in error it is not shown here. In this same assignment it is complained that the District Attorney General's argument is improper and prejudicial. There was only one objection raised to this argument at the time of the trial. Of course, the objections which were not made cannot be relied upon as error on appeal. *Turner v. State,* 188 Tenn. 312, 219 S.W.2d 188. The portion of the argument, which was objected to was immediately stricken, and the judge told the jury not to consider it. This being true, there is clearly no error in it. The argument is made that this was in the minds of the jury and several cases are cited wherein this Court reversed because the Court felt that this did so prejudice the plaintiff in error in that particular case that there was not a fair trial. By our reading of this argument, and we have read the argument in the record, we do not feel that it was such an argument under the circumstances of this particular case as would have any effect or influence on the judgment of the jury herein. These assignments are accordingly overruled.

60

It is said that the trial judge erred in charging the jury with reference to the Federal Gambling Stamp thus:

"There is a direct and open connection between the possession of a Federal gambling stamp authorizing gambling and the ultimate fact of such gambling. The interests of man are such, and experience teaches, that they do not ordinarily incur the expense and trouble of procuring license to engage in gambling, unless they intend to do so. In the absence of rebutted proof, the inference might well be drawn that the one who pays the fees possesses himself of such gambling license is engaged in professional gambling."

This charge is taken almost directly from *Acklen v. State,* supra, and cases therein cited. The contention is that the charge goes beyond the holding in that case, because the Court held that the possession of a Federal Tax Stamp raised a presumption of gambling activities and not of professional gambling as charged by the court. This statement, above, that the court made to the jury is in direct accord to what we held in the Acklen case. We held there that when a person complies with the Federal law in regard to wagering it will be presumed that he fully intended to engage in the activities for which the tax was levied and paid. The record in this case clearly shows that the activities covered by the Federal Tax Stamp are of three general varieties, all of which are completely encompassed by the definition of professional gambling as defined by sec. 39-2033, T.C.A. Therefore, it would seem to us that the activities covered by the Federal Wagering Tax are by definition professional gambling under the laws of this State. This being true

the charge given by the trial judge would not be erroneous.

Then it is assigned and argued by plaintiff in error that this charge, or the portion thereof above quoted, is in fact a charge by the court to the jury on the facts of this case in violation of our Constitution, Art. VI, sec. 9. In portions of the charge upon which this attack is made the court instructs the jury as to the legal presumptions which arise in regard to Federal Wagering Tax Stamps. The distinction between presumptions and an inference was noted by this Court in *Camper v. State,* 187 Tenn. 511, 216 S.W.2d 18, thus:

"A 'presumption' and an 'inference' are not the same thing. A 'presumption' being a deduction which the law requires a trier to make; an 'inference' is a deduction which the trier may or may not make according to his own conclusions. A presumption is mandatory; an inference, permissible."

It seems to us the instruction here given when read as a whole is an accurate statement of the law of this State.

Before closing we think a comment is required on the case cited in the Supplemental Brief of *Elmore v. State,* 135 Tenn. 347, 186 S.W. 453. It is very forcibly argued that under this case the case of *Brinkley v. State,* 125 Tenn. 371, 143 S.W. 1120, which we refer to in the Acklen case, had been modified in that in the Elmore case it could there have been held that the name, Mrs. A. Elmore, to whom a liquor license had been issued, was not the same as a Mrs. Mae Elmore who had been indicted for selling liquor within the four mile law. We have carefully Shepardized this case, and, as far as this point is concerned, it has never been cited since. A careful

reading of the case shows, too, the facts upon which this statement was based in the opinion by a Special Justice were entirely different from the facts of the instant case (of course, what we are referring to here now are the names and the Federal Tax Stamp question), because in the Elmore case she was issued a license for Mrs. Mae Elmore, 320 High Street, Memphis, Tennessee, when the record shows at the time that she was not living there but was living several miles away. Then, too, the real basis of the reversal in that case was the fact that it wasn't shown that this liquor was being sold within four miles of the school house. We feel satisfied under this case it has nothing to do with the factual situation herein.

After a very careful consideration of all questions herein raised, the record, briefs and all, we are satisfied that without question there is no error in this record. Accordingly the judgment below must be affirmed.